**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MAURICE BROWN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 12 CV 5710 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CLUB ASSIST ROAD SERVICES U.S., INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiffs' motion for preliminary injunction, to maintain documents under seal, and to extend opt-in period [105] and motion to supplement the record with affidavits in support of their motion for preliminary injunction [114]. For the reasons stated below, the Court grants the motion to supplement [114] and denies the motion for preliminary injunction, to maintain documents under seal, and to extend opt-in period [105]. Plaintiffs are given until 5/21/2014 to show cause why the names of the opt-in Plaintiffs should remain under seal. This matter is set for status on 5/28/2014 at 10:30 a.m. The parties should be prepared to discuss Plaintiffs' outstanding motion to strike Defendant's third-party complaint [75] with the Court at that time.

**I.      Background**

Named Plaintiffs Maurice Brown, Kenith Rodgers, Keith Rodgers, Kaywan Palmer, Byron Jackson, Rushdi Rashid, and Nasir Rashid (collectively "Plaintiffs") are emergency road service drivers. Each of them has created a business entity, which the parties refer to as "service delivery companies" or "SDCs," that has contracted with Defendant Club Assist Road Services U.S., Inc. ("Defendant" or "Club Assist") to provide emergency road services to members of the

American Automobile Association ("AAA"). Under the contracts, Defendant routes service calls to SDCs and pays them on a per-job basis.

Plaintiffs, the proprietors of the SDCs, contend that they are "employees" of Defendant such that they are entitled to be paid a minimum wage under the Fair Labor Standards Act ("FLSA") and similar state laws, and that they should be entitled to participate in Defendant's employee benefits programs. Plaintiffs also contend that Defendant "suspended, terminated, and otherwise discriminated against each of [them] in retaliation for their involvement in the instant litigation." [78] ¶ 204. Defendant disputes that Plaintiffs are its "employees." Defendant contends that it contracted with the SDCs, not with Plaintiffs, and therefore the SDCs (or Plaintiffs, who run them) bear responsibility for Plaintiffs' allegedly inadequate earnings. Defendant also denies retaliating against Plaintiffs.

Plaintiffs filed the instant lawsuit in on July 20, 2012, see [1], and subsequently obtained conditional certification to proceed as a collective action under the FLSA. See [53]. The litigation has been contentious. Plaintiffs and Defendant were unable to agree on a notice and consent form to be sent to prospective opt-in plaintiffs. See [66]; [82]. Defendant filed a third-party complaint against Plaintiffs' SDCs, [65], which Plaintiffs have moved to strike [75]. Plaintiffs now contend that Defendant retaliated against them for filing suit and is intimidating potential opt-in plaintiffs to prevent them from joining or participating in the suit. Plaintiffs seek a preliminary injunction to enjoin the alleged retaliatory behavior [105]. Plaintiffs also request that the Court maintain the opt-in consent forms under seal and extend the opt-in period. See [105].

The Court took briefing on Plaintiffs' motion for preliminary injunction, see [110]; [111], and held a hearing on the motion on March 12, 2014. After the hearing, Plaintiffs moved to

supplement the record with additional affidavits in support of their motion for preliminary injunction [114]. Defendant opposes the motion to supplement as untimely under Federal Rule of Civil Procedure 6(c) and Local Rule 78.4. See [118].

## II.  Discussion

### A.  Motion to Supplement [114]

#### 1.  Background

The day before a scheduled status hearing in this matter, Plaintiffs filed a motion for preliminary injunction, to maintain documents under seal, and to extend opt-in period [105]. Plaintiffs did not file a brief in support of their motion at that time. At the status hearing the next day, the Court set a briefing schedule that gave Plaintiffs one week to file their memorandum in support. See [108]. The Court gave Defendant two weeks to respond. See *id.* Plaintiffs' timely filed brief indicated their intention to "show through live testimony and affidavits at the hearing on this motion" that Defendant "has retaliated against everyone to whom it knows to have joined the suit." [110] at 1. Plaintiffs did not attach any affidavits to their brief, however. See *id.* Defendant timely filed its response brief, see [111] and appended a lengthy affidavit from Rodney Walbancke, its General Manager, see [111-2], an affidavit from one of its business managers, Charles Day, see [111-3], an affidavit from one of its field coordinators, Robert Pivirotto, see [111-4], and various other supporting exhibits.

The day before the scheduled hearing, pursuant to the Court's order, see [108], the parties jointly submitted a witness list. See [112]. Plaintiffs indicated that they had "disclosed * * * five witnesses to opposing counsel." *Id.* All but one of these witnesses were named Plaintiffs. See *id.* Defendant indicated that it might call affiant Rodney Walbancke. See *id.*

At the hearing, Plaintiffs' counsel informed the Court that Plaintiffs planned to call three

of their five identified witnesses: named Plaintiffs Keith Rodgers and Maurice Brown, and "comparator" opt-in Plaintiff Robert Moore. See Tr. 15-16, Mar. 12, 2014. Plaintiffs' counsel also informed the Court that he had prepared some affidavits of Plaintiffs who were not in attendance at the hearing. Counsel expressly noted that affidavits were "from each of the remaining named plaintiffs basically responding to the allegations already in Mr. Walbancke's" affidavit. Tr. 18-19, Mar. 12, 2014. He did not tender the affidavits at that time. Rather, he indicated that "at some point I would want to introduce those to the court" and sought "guidance" about how to do so. Tr. 11-12, Mar. 12, 2014. The Court directed Plaintiffs to file a motion for leave to supplement the oral record with the proposed affidavits. See *id.* at 12. Defense counsel objected to the submission of affidavits as untimely under Federal Rule of Civil Procedure 6 and Local Rule 78.4. See *id.* He also averred that Plaintiffs effectively had deprived Defendant of the opportunity to respond to the testimony or cross-examine the declarants at the hearing. See *id.*

The Court noted Defendant's objections and stated that it would "make sense" for Plaintiffs to "file a motion for leave to supplement the preliminary injunction oral record with these affidavits." *Id.* That way, the Court continued, Defendant's counsel "can have a look at them and decide number one, whether they're objectionable, and number two, whether he needs some sort of counter affidavit to counter them or whether he just wants to stand on his objections under the Rules." *Id.* The Court added that it understood that "you can't get everybody here and you want to put some stuff in the record," but noted that "it's just a matter of letting your adversary test that." *Id.* at 13. Plaintiffs requested and were given one week in which to file their motion, and Defendant was given two weeks to submit a response. *Id.* at 171. Plaintiffs filed their motion within the allotted time and attached six affidavits to it. See [114-1]-[114-6].

Five of the affidavits were from named Plaintiffs, two of whom were included on the witness list disclosed to Defendant. See [114-1]-[114-5]. The sixth was from an opt-in Plaintiff from Connecticut and included four exhibits regarding the affiant's interactions with the Connecticut Department of Labor. See [114-6]. Defendant filed a response [118], and attached rebuttal affidavits from Rodney Walbancke and James Connelly, as well as additional exhibits. See [118-1]-[118-2].

## 2.    Analysis

Defendant argues that the motion to supplement should be denied because Plaintiffs' proffered affidavits are untimely under and subvert the purposes of Federal Rule of Civil Procedure 6(c)(2) and Local Rule 78.4. Defendant's arguments have some merit, but Defendant in fact responded to Plaintiffs' belated affidavits. The parties thus are in the positions in which they would have been had Plaintiffs complied with Rule 6(c)(2) and Local Rule 78.4 in the first instance. As a result, denial of Plaintiffs' motion to supplement for failure to comply with the applicable procedural rules is not warranted. Instead, the Court grants the motion to supplement [114], and also will consider the rebuttal evidence that Defendant submitted in response thereto. See [118-1]-[118-2].

Rule 6(c)(2) provides that "[a]ny affidavit supporting a motion must be served with the motion," and that "[e]xcept as Rule 59(c) provides otherwise, any opposing affidavit must be served at least 7 days before the hearing, unless the court permits service at another time." Local Rule 78.4 similarly provides that "[w]here evidentiary matter, in addition to affidavits permitted or required under Rules 5 or 6 under the Federal Rules of Civil Procedure, will be submitted in support of a motion, copies thereof shall be served with the notice of motion." These rules are animated by the concern that a party opposing a motion may not have an adequate opportunity to

respond to belatedly presented evidence. See 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2949, at 237 (2013); see also *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 476 (6th Cir. 2002) ("Fed. R. Civ. Pro. 6's requirement that cause be shown for affidavits not attached to the original motion, is designed to prevent the moving party from springing new facts on the nonmoving party 'when it is too late for that party to contest them.'" (quoting *RepublicBank Dallas, N.A. v. First Wis. Nat'l Bank of Milwaukee*, 636 F. Supp. 1470, 1472 (E.D. Wis. 1986))); *Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 356 (5th Cir. 1971) ("The right of defendants to present controverting factual data is illusory unless there is adequate notice of plaintiffs' claims."). "Although the timing requirements are applied flexibly in practice, the underlying principle of giving the party opposing the application notice and an opportunity to respond is carefully honored by the courts." Wright, Miller & Kane § 2949.

Here, it is unclear why Plaintiffs did not procure the affidavits and accompanying evidence and furnish them to Defendant in conformity with the strictures of Rule 6(c)(2) and Local Rule 78.4. Plaintiffs instead provided the affidavits and evidence shortly after the preliminary injunction hearing, "basically responding to the allegations already in Mr. Walbancke's" affidavit. In this sense, Plaintiffs proceeded as though they were submitting a reply brief in support of their motion – a reply brief accompanied by new evidence. Then, as though it were submitting a surreply, Defendant countered and responded to Plaintiffs' new evidence. *Cf. Almy v. Kickert Sch. Bus Line, Inc.*, 2013 WL 80367, at *15 (N.D. Ill. Jan. 7, 2013) (granting leave to file surreply where reply brief "did not raise new arguments but was accompanied by exhibits not previously submitted or discussed").

Although it would have been preferable for this exchange to have occurred in advance of

the hearing, the Court is unable to discern any prejudice to Defendant that occurred as a result of Plaintiffs' belated evidentiary production. This case is not like *Marshall Durbin Farms*, in which the Fifth Circuit reversed a grant of a preliminary junction because plaintiffs dumped more than 175 pages of affidavits on defendants at the beginning of the preliminary injunction hearing.  See *Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 357 (5th Cir. 1971).  In *Marshall Durbin Farms*, "[t]here was no way in which the defendants, in a hearing that was required to be held and completed that day, could controvert with opposing affidavits or live testimony the details of the dozens of newly revealed occurrences." *Id.*  "Indeed, defendants had no opportunity even to determine if evidence existed that might contradict the new affidavits." *Id.*  Here, by contrast, Defendant had two weeks to evaluate Plaintiffs' new affidavits – in the context of what had been presented at the hearing, no less – and counter them with evidence of its own.  Moreover, Defendant had a chance to cross-examine some of Plaintiffs' affiants at the hearing.  The situation may not have been ideal, but the Court is satisfied that Defendant's rights will be sufficiently protected if the Court considers the non-conclusory portions of both Plaintiffs' and Defendant's post-hearing evidentiary submissions.

### B.     Motion for Preliminary Injunction, to Maintain Documents Under Seal, and to Extend Opt-in Period [105]

#### 1.     Background

It is undisputed that Defendant ceased doing business with several of Plaintiffs' SDCs after this lawsuit was initiated.  Plaintiffs assert that Defendant stopped doing business with their SDCs in retaliation for Plaintiffs' prosecution of this lawsuit and seek to enjoin Defendant "from terminating or otherwise retaliating against any member of the conditionally certified class for participating in this action."  [105] at 1; see also [105] at 3 ("Plaintiffs pray this Court to [e]njoin Club Assist from discharging or otherwise discriminating against drivers that opt in to the suit or

offer testimony in this matter."); [110] at 1 ("[T]he Court should issue a preliminary injunction prohibiting further acts of retaliation and then allowing class members to opt-in to this suit without fear of such reprisals."); *id.* at 11 (asking the Court to enter an order requiring Defendant "to refrain from further reprisals against the class members whom the named plaintiffs have an obligation to represent"). Plaintiffs also seek to maintain under seal the names of the opt-in Plaintiffs, and to further extend the opt-in period "so that any class member who was previously intimidated by Club Assist's actions has the opportunity to reconsider and opt in without the threat of retaliation looming." The facts set forth below were adduced at the hearing or through Plaintiffs' and Defendant's affidavits. *Cf. Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010) ("And even if Dexia's evidence was inadmissible under the Federal Rules of Evidence, we have recognized that a district court may grant a preliminary injunction based on less formal procedures and on less extensive evidence than a trial on the merits.")

### a. Named Plaintiffs

Named Plaintiff Maurice Brown was the proprietor of 2Browns LLC ("2Browns"). 2Browns entered into a contract with Defendant on July 18, 2011. Plaintiffs' Ex. 5. Brown filed this lawsuit on July 20, 2012. See [1]. At some point in July 2012, Brown notified Defendant's General Manager, Rodney Walbancke, that 2Browns was unable to perform its obligations under the contract because its tow truck had broken down. [111-2] ¶ 16. On or about August 1, 2012, Walbancke responded with a letter expressing "surprise[] that 2Browns LLC cannot afford to fix its truck" and informing 2Browns that Defendant was "not in a position to supply a rental truck." [111-2] ¶ 17; *id.* Ex. A. Walbancke's letter also informed 2Browns that it was in breach of its agreement with Defendant and asked 2Browns what it planned to do to comply with its contractual obligations. [111-2] Ex. A. The next communication in the record

is an August 17, 2012 e-mail from Brown to Walbancke.  See [111-2] ¶ 18; *id.* Ex. B.  In that e-mail, Brown informed Walbancke that "[a] local garage mechanic performed a temporary fix" on the truck but that Brown was "gonna need money for gas and other operational expenses."  [111-2] Ex. B.  Walbancke responded via e-mail on August 21, 2012.  See *id.*  In that response, Walbancke asked Brown when 2Browns would be available for service.  *Id.*

That same day, Brown notified Walbancke that some batteries had been stolen from his truck.  [111-2] ¶ 19.  Walbancke asked Brown if he had submitted an insurance claim for the batteries, *id.*; [111-2] Ex. C, and Brown informed Walbancke that 2Browns did not have insurance.  [111-2] ¶ 19.  On August 27, 2012, Walbancke sent Brown an e-mail with two letters dated August 24, 2012 attached to it.  [111-2] Ex. D.  The first letter informed 2Browns that Defendant believed that it was in breach of Section 21.1 of the parties' agreement, which required 2Browns to maintain insurance.  *Id.*  The letter further stated that although Defendant believed it was entitled to terminate 2Browns' agreement immediately, it was electing to suspend 2Browns until it provided Defendant with proof of insurance.  *Id.*; see also [111-2] ¶ 22.  The second letter stated Defendant's position that 2Browns was responsible for providing and operating its truck pursuant to Section 10.1 of the parties' agreement.  *Id.* Ex. D.

On August 30, 2012, Walbancke sent an e-mail to Brown "in response" to an e-mail that Brown had sent to Defendant.  See [111-2] Ex. E.  It is not clear which e-mail Walbancke was responding to, or whether that e-mail is in the record.  Walbancke's e-mail stated that Defendant "is not in a position to assist you or any other SDC with financial assistance to operate your business."  *Id.*  Attached to this e-mail were two documents dated August 29, 2012.  See *id.*  The first was a letter reiterating that "2Browns continues to be suspended from providing any services" until it obtains insurance.  *Id.*  The letter also provided, "Alternatively, if 2Browns is

unable or unwilling to perform its obligations under the Agreement, I have attached an agreement of termination for execution by 2Browns." *Id.* The agreement of termination was the second attachment. See *id.* It recited that "Club Assist and the SDC have agreed to terminate the Service Delivery Agreement" and was signed by Walbancke. *Id.* There was a line for Brown's signature. See *id.* 2Browns did not return the termination agreement or provide proof of insurance. [111-2] ¶ 26. In late September or early October 2012, Bush Truck Leasing informed Walbancke that it had repossessed 2Browns' tow truck. See [111-2] ¶ 25; *id.* Ex. F. Some of Defendant's equipment was missing from the truck. *Id.* Ex. F.

At the hearing, Brown testified that Defendant had loaned him $6,300 to fix his truck about a year before he filed the lawsuit. Tr. 123, 127, Mar. 12, 2014. He further testified that Defendant, not Bush Truck Leasing, repossessed his truck "even though the payments were still being made to Bush Truck Leasing by the guarantor of the lease," and that Defendant "gave [his] truck to another SDC before [he] had a chance to even, you know, save up $2,400." *Id.* at 123. He also testified that prior to the lawsuit, his truck had been out of service for at least a full day but he had not been terminated. *Id.* at 127-28. Brown conceded, however, that 2Browns lacked insurance and did not have a truck with which to provide services after its truck was repossessed in or around September 2012. See *id.* at 140-42.

Named Plaintiff Keith Rodgers ("Keith")[1] started an SDC, Rapid Road Service, Inc. ("Rapid") in July 2011. Tr. 58, Mar. 12, 2014; [111-2] ¶ 68. Keith testified that he was no longer operating his SDC because Walbancke told him that his "service was no longer needed to Club Assist." Tr. 58, Mar. 12, 2014. Keith testified that Walbancke did not explain why his

---

[1] Keith Rodgers and Kenith Rodgers are both named Plaintiffs in this matter. The Court refers to them by their first names to avoid confusion. For the same reason, the Court also refers to named Plaintiffs Rushdi Rashid and Nasir Rashid by their first names.

SDC's services were no longer needed. *Id.* After "pa[ying] attention to all the facts," however, Keith concluded that Defendant ended its relationship with his SDC because he had "entered into the lawsuit." *Id.* at 59. Keith conceded that he had logged in late, and that Defendant had apprised him of this fact, but testified that many other SDC operators also logged in late. *Id.* at 59-60; see also Plaintiffs' Ex. 1.

For its part, Defendant conceded that it in fact terminated Rapid's contract after Rapid logged in late on January 30, 2013. [111-2] ¶ 70. Defendant also presented affidavit testimony and exhibits demonstrating that it offered Keith and Rapid an opportunity to develop an action plan to address Rapid's repeated failures to log in and respond to calls. [111-2] ¶¶ 61-62. Rapid developed an action plan in November 2012 pursuant to which it acknowledged that any more breaches would result in its termination. See [111-2] Ex. O. Rapid then logged in late on at least twelve occasions in December 2012 and January 2013. [111-2] ¶ 65. Defendant offered Rapid a final opportunity to cure, [111-2] ¶ 66, pursuant to which it again agreed that further performance issues would result in termination. *Id.* ¶ 69. Defendant terminated Rapid's contract after Rapid logged in late on January 30, 2013. *Id.* ¶ 70.

Named Plaintiff Kaywan Palmer submitted an affidavit stating that he incorporated an SDC, KDP Auto Repair & Emergency Roadside Service LLC ("KDP"), on September 4, 2010. [114-2] ¶ 3. He joined this lawsuit as a named Plaintiff in October 2012. *Id.* Defendant offered to renew KDP's contract in December 2012, but it offered only a one-year renewal instead of the two-year renewal "unlike every other contract Club Assist entered into during the time that [Palmer] worked for them." *Id.* ¶¶ 9-10. Defendant told Palmer that it was offering a one-year renewal so that KDP could finish paying off its truck; Defendant planned to switch to new trucks the following year and, according to Palmer, did not want to be "stuck paying off [his] truck

even though it did not intend to use it in the future." *Id.* ¶¶ 12-13. KDP's truck broke down in April 2013 but KDP could not afford to fix it. *Id.* ¶¶ 14-15. Defendant did not offer to advance KDP the costs of fixing the truck. *Id.* ¶ 19. KDP began using Palmer's personal truck to complete its work, but soon that truck also broke down. See *id.* ¶¶ 16-17. Palmer testified that he notified Defendant "on multiple occasions," "mostly via text messaging," that KDP was not able to perform services because its truck was not operable. *Id.* ¶¶ 18, 21. He claims that he only received one letter from Defendant: a letter dated July 13, 2013, terminating KDP's contract. *Id.* ¶ 20. Palmer conceded that he did not log in "for weeks" while his trucks were out of commission. *Id.* ¶ 18.

According to Defendant's submissions from Walbancke, KDP failed to provide services for two 9-10 day stretches in March and April 2013 and for a 28-day period in May 2013. *Id.* ¶¶ 51-52. Defendant gave KDP an opportunity to develop an action plan to address its performance deficiencies, [111-2] ¶ 55; *id.* Ex. K, and terminated KDP only after KDP failed to submit an action plan or otherwise respond to Walbancke's frequent overtures. [111-2] ¶¶ 57-59; Ex. L. Walbancke testified twice that he attempted to contact Palmer and KDP on "eighteen separate occasions from May 17th to June 10th, but did not receive any response." [118-1] ¶ 51; [111-2] ¶¶ 53, 57. Walbancke testified that he sent KDP at least two letters before the parties' relationship was terminated: one dated May 28, 2013, and one dated June 10, 2013. [111-2] ¶¶ 55, 58; *id.* Exs. K, L.

Named Plaintiff Kenith Rodgers ("Kenith") testified via affidavit that he incorporated his SDC, Rodgers Emergency Roadside Assistance Incorporated ("Rodgers Inc.") in October 2010. [114-3] ¶ 5. Because Defendant did not provide Rodgers Inc. with the truck that it had promised, however, Rodgers Inc. did not actually enter into a contract with Defendant or begin to provide

services until April 2011. *Id.* ¶¶ 6-8. Kenith testified that the truck that Defendant directed him to lease had previously been damaged in an accident and "frequently broke down." *Id.* ¶ 10-11. Defendant often advanced Rodgers Inc. the costs of the repairs upfront but would deduct the amounts from the money Rodgers Inc. earned. *Id.* ¶ 12. By the end of 2012, Defendant was deducting $500 from every paycheck to recoup the repair expenses it had advanced to Rodgers Inc. *Id.* ¶ 13. After Kenith joined this suit in October 2012, Defendant stopped providing Rodgers Inc. with accountings of the deductions. *Id.* ¶¶ 14-15. Kenith "demanded a reconciliation form" at some point and learned that Defendant had been making deductions based on Rodgers Inc.'s alleged failure to remit invoices for every battery sale it made. *Id.* ¶¶ 18-19. Rodgers Inc.'s truck needed "significant repairs" in December 2012, and Defendant agreed to advance Rodgers Inc. $1,829.97 for the repairs. *Id.* ¶ 21; [111-2] ¶ 40; [118-1] ¶ 43. Defendant then began deducting more money from Rodgers Inc.'s pay to cover this advance. [114-3] ¶ 22. Because of the deductions and a low-earning December 2012, Rodgers Inc. "could not afford to continue to drive for Club Assist, and sometimes had to take [its] truck off the road." *Id.* ¶¶ 24-25.

Walbancke agreed that Defendant deducted money from Rodgers Inc.'s reconciliations "based on Rodgers, Inc.'s failure to turn in invoices for all the batteries it sold." [118-1] ¶ 45. Walbancke testified, however, that Defendant always provided Rodgers Inc. with monthly statements detailing the deductions. *Id.* ¶ 44. Rodgers Inc. did not provide services from February 8-19, 2013, [111-2] ¶ 42. Rodgers Inc. notified Defendant of its inability to provide services "in early February 2013." [118-1] ¶ 46. Because Defendant believed that Rodgers Inc. was "bringing Club Assist's name into disrepute and was undermining [its] contractual relationship with AAA," [118-1] ¶ 46, by failing to provide services and accepting calls but not

following through with tows, Defendant sent Rodgers Inc. a termination agreement dated February 22, 2013. See [111-2] ¶¶ 44, 47; *id.* Ex. J.

Named Plaintiff Byron Jackson incorporated his SDC, Jackson 24-7 Road Service, Inc. ("Jackson 24-7") in October 2009. [114-1] ¶ 8. Jackson 24-7 entered into a contract with Defendant shortly thereafter. *Id*. ¶ 9. Jackson 24-7 entered into an agreement to lease a 2009 model tow truck from Bush Truck Leasing around the same time. *Id.* ¶¶ 10, 15. Jackson testified that Defendant "guaranteed the payments on that lease, which required the lessee to cover the remaining value of the truck upon expiration of the lease." *Id*. Defendant does not dispute this. Jackson 24-7 renewed its contract with Defendant in July 2011. *Id.* ¶ 11. In June 2012, Walbancke called a meeting of all Chicago-area SDCs. *Id.* ¶ 12; see also Plaintiffs' Ex. 2. Jackson testified that at the meeting, which per the announcement occurred on July 10, 2012, see Plaintiffs' Ex. 2, Walbancke "mentioned that he was aware of this lawsuit, which Maurice Brown had already filed." [114-1] ¶ 13. (The Court is skeptical of this testimony, as Brown filed this lawsuit on July 20, 2012. See [1]. Jackson joined it in October 2012. [114-1] ¶ 18). Jackson further testified that Walbancke told him that Defendant would soon be switching to newer model trucks and that Jackson 24-7 would no longer be able to drive its current truck after the transition. [114-1] ¶ 16. Defendant made a similar announcement to all SDCs in spring 2013. *Id.* ¶ 19. Jackson 24-7 applied for a new lease with Bush Truck Leasing around that time, but its application was rejected even though it had been making payments on a Bush Truck lease for four years. *Id.* ¶¶ 19-20. Bush Truck Leasing later explained that Defendant had not guaranteed the payments on this lease. *Id.* ¶ 22. Jackson contemplated purchasing his own truck, but decided not to after Club Assist employee Burjis Sidhwa came to his house and advised him not to do so unless he could get a guarantee that Jackson 24-7's contract with

Defendant would be renewed again. *Id.* ¶¶ 23-25. Defendant later refused to renew Jackson 24-7's contract because it did not have a new truck. *Id.* ¶ 28. Walbancke nonetheless told Jackson to keep logging on and provide services with the old truck, which Jackson did until Walbancke told him to stop doing so in September 2013. *Id.* ¶ 31.

According to Walbancke, Jackson 24-7 declined to enter into a new agreement with Defendant when its old agreement expired on or about July 14, 2013. See [111-2] ¶¶ 11-12; [118-1] ¶ 32. Walbancke testified that the same thing happened with respect to at least two other SDCs whose proprietors are not named Plaintiffs in this matter. [111-2] ¶ 14; [118-1] ¶ 33. Walbancke also testified that "Club Assist has never co-signed a lease agreement between the service delivery companies and Bush Truck Leasing, Inc.," [118-1] ¶ 30, but that it "did not guaranty the lease payments for any service delivery company in the summer of 2013" even though it had "guaranteed lease payments in the past." *Id.* ¶ 31.

Named Plaintiff Nasir Rashid ("Nasir") formed his SDC, N R Auto Roadside Service LLC ("NR"), in June 2012, one month before this lawsuit was initiated. [114-5] ¶ 3. NR entered into agreements to lease a truck from Bush Truck Leasing and to provide services to Defendant at around the same time. *Id.* ¶¶ 4-5. Nasir's cousin, named Plaintiff Rushdi Rashid ("Rushdi"), formed his own SDC, R&R Roadside Service LLC ("R&R"), in June 2012. [114-4] ¶ 5. Like NR, R&R also entered agreements to lease a truck and to provide services to Defendant contemporaneously. *Id.* ¶¶ 6-8. During the first few months of their contracts, NR and R&R were frequently dispatched to calls that were long distances away from their trucks' current locations. *Id.* ¶ 9; [114-5] ¶ 7. This happened to them more often than it did to other SDCs, [114-4] ¶ 10; [114-5] ¶ 8, and they believed that Defendant's dispatchers were inefficiently distributing calls. [114-4] ¶ 11; [114-5] ¶ 9. Nasir and Rushdi both testified (via affidavit) that

their SDCs "occasionally missed calls, refused calls, or were late to calls as a result of this inefficient and unfair dispatch system." [114-4] ¶ 12; [114-5] ¶¶ 10, 25. Nasir testified that he missed "around five calls." [114-5] ¶ 24. Both Nasir and Rushdi testified that other unnamed SDCs also missed calls, refused calls, and were late to calls during the same period. [114-4] ¶¶ 13, 35; [114-5] ¶ 11. Eventually, Nasir and Rushdi complained to Defendant about the long-distance dispatches, and Walbancke confirmed that their SDCs had been traveling further than other SDCs and "offered to provide an additional fuel subsidy [ ] to make up for this additional travel." [114-4] ¶¶ 15-16; [114-5] ¶¶ 13-14. Notwithstanding Walbancke's assurances, NR and R&R "did not see any improvement in the way calls were dispatched." [114-4] ¶ 17; [114-5] ¶ 15. NR and R&R took matters into their own hands and began communicating with other SDCs to redistribute calls to the SDCs who were closest to the jobs. [114-4] ¶ 18; [114-5] ¶ 16. Defendant told NR and R&R to stop this practice. [114-4] ¶ 19; [114-5] ¶ 17.

Nasir and Rushdi "grew frustrated" and in November 2012 asked Plaintiffs' counsel to notify Defendant that Plaintiffs' counsel would be representing them and that they would likely become named Plaintiffs. [114-4] ¶¶ 20, 27; [114-5] ¶¶ 18-19. Robert Pivirotto, a field coordinator for Defendant, testified that R&R failed to respond to several calls in January 2013 and in that same month Rushdi "screamed at" and "threatened" Pivirotto. [111-4] ¶ 5. Pivirotto also testified that R&R missed calls and did not log in properly on several occasions in February 2013. See *id.* As to NR, Pivirotto testified that it too failed to answer and refused calls in January and February 2013. *Id.* ¶ 6. Pivirotto further testified that during one of the calls, Nasir told him that the client was "55 fucking miles away" and hung up on him. *Id.* Rushdi disputes Pivirotto's accounts. See [114-4] ¶ 32-33. Both Nasir and Rushi dispute Walbancke's testimony that he sent them letters describing their SDCs' alleged misconduct and offering them the

opportunity to submit "action plans" to cure the alleged deficiencies in mid-February 2013. See [111-2] ¶¶ 30, 36; *id.* Exs. H, I; [114-4] ¶ 29; [114-5] ¶ 20. Both Nasir and Rushdi testified that Defendant instead called a meeting with them at a hotel and ambushed them with the letters at that time. [114-4] ¶¶ 30-31; [114-5] ¶¶ 21-22. Neither Nasir nor Rushdi believed that they could devise an "action plan" sufficient to satisfy Defendant, and therefore did not submit one. See [114-4] ¶ 36; [114-5] ¶ 26. Both Nasir and Rushdi testified that Defendant terminated their relationships by repossessing their trucks. [114-4] ¶ 36; [114-5] ¶ 26. Pivirotto testified that Nasir and Rushdi telephoned him and told them that they were through running calls and planned to leave their trucks on the side of the road. [111-4] ¶¶ 5-6.

### b.    Opt-In Plaintiffs

Plaintiffs also submitted the testimony of two Plaintiffs who have opted into the suit but whose participation was not disclosed to Defendant. See [98]. Robert Moore, who testified at the hearing, averred that he was the proprietor of an SDC that had entered a contract with Defendant. Tr. 29-30, Mar. 12, 2014. He acknowledged that he had logged in late on occasion, sometimes up to a couple of hours late. *Id.* at 31-32. Moore also stated that he had failed to log in altogether on at least four occasions, three when he was ill and once when his truck "had an issue." *Id.* at 32. Moore further testified that it sometimes took him more than an hour to arrive at the scene after receiving a dispatch from Defendant. *Id.* at 33. At one point, Moore also informed Defendant that he did not have worker's compensation insurance, *id.* at 35, and at some point he lacked general liability insurance. *Id.* at 45. Notwithstanding all of these infractions, Moore testified that he had "never been suspended" and had never had to develop an action plan. *Id.* at 33, 36. Additionally, Defendant once loaned him money to fix his truck, *id.* at 34-35, and co-signed his lease for a truck in 2009 or 2010. *Id.* at 37.

Moore testified that in the three years before this lawsuit, Defendant terminated three SDCs. *Id.* at 30. He further testified that "all the guys that signed up for this particular lawsuit one way or another lost their jobs." *Id.* He therefore was "afraid that [he] would lose [his] job" if he joined the lawsuit and declined to become a named Plaintiff when the second amended complaint was filed in November 2013. *Id.* at 38. Moore explained that he thought that losing his job was a "likely possibility" because "the other guys that signed up lost their jobs for one reason or another, and also, there was a lot of different talk from different guys saying what would probably happen." *Id.* Ultimately, however, Moore opted in on "the very last day" of the "first opt-in period" because he feared that if he did not, "[he] would have felt like [he] wasn't doing what was best for [him] to do." *Id.* at 40. When asked whether he joined the lawsuit because he was "no longer intimidated," Moore responded that he was "just putting it in God's hands" but "still feel[s] like something is going to happen." *Id.* at 51.

On cross-examination, Moore admitted that he had never asked the other Plaintiffs why their contracts were terminated. *Id.* at 46. He "didn't know" that 2Browns' insurance lapsed, or that Rapid logged in late "on 12 separate occasions in a one-month period." *Id.* at 46-47.

Plaintiffs also presented the affidavit testimony of opt-in Plaintiff Christopher Oquendo ("Oquendo"). All of Oquendo's testimony pertains to events that happened in 2011 and early 2012, before this suit was filed. See [114-6]. According to Oquendo, he created an SDC called Oquendo Delivery Service LLC ("Oquendo Delivery") in September 2011. [114-6] ¶ 3. Oquendo Delivery entered into a contract with Defendant on September 16, 2011. *Id.* ¶ 6. Oquendo quickly began to butt heads with Defendant's representatives, Walbancke and Jim Connelly, who "regularly admonished [him] for not being available for dispatch at precisely the times Club Assist required." *Id.* ¶¶ 10, 14. Before the end of September 2011, Oquendo

informed Walbancke of his frustration and his belief that he was being treated as though he were an employee of Club Assist. *Id.* ¶ 15. Oquendo made a similar complaint to Connelly shortly thereafter. *Id.* ¶ 17. Around the same time, Oquendo Delivery was suspended for one day after logging off when it was scheduled to work. See *id.* ¶ 19. Oquendo had a phone call with Walbancke and Connelly after that incident, during which Walbancke told him that Defendant was acting according to its contract with Oquendo Delivery and that Oquendo could leave if he did not like it. *Id.* ¶ 20. Oquendo told Connelly and Walbancke that he might have to complain to the Connecticut Department of Labor ("CDOL"), *id.* ¶ 21, which he in fact did on September 28, 2011. *Id.* ¶ 22. The CDOL launched an investigation. *Id.* ¶ 23. Oquendo declined to remain anonymous. *Id.* ¶ 24.

In mid-December 2011, Oquendo noticed that Oquendo Delivery was not receiving any calls from Defendant. *Id.* ¶¶ 27-28. Oquendo called AAA (with whom Defendant contracts to provide towing services) and was told that Walbancke had ordered that Oquendo be logged off the system whenever he tried to log in. *Id.* ¶ 29. On December 17, 2011, Oquendo called Walbancke to ask about that directive. *Id.* ¶ 30. Walbancke told him that Defendant was terminating Oquendo Delivery's contract due to customer complaints. *Id.* Oquendo asked Walbancke to send him the customer complaints. *Id.* ¶ 31. Walbancke sent Oquendo three customer surveys that purportedly contained only positive customer feedback. *Id.* ¶ 33. (Those surveys are not in the record.) On December 20, 2011, Oquendo received a letter dated December 12, 2011 that terminated Oquendo Delivery's contract with Defendant. *Id.* ¶ 33. Oquendo testified that the letter, which Defendant placed in the record, see [118-1] Ex. F, explained that the termination was predicated on Oquendo Delivery's failure to be available to receive calls. [114-6] ¶ 34. The letter by its terms stated only that "Club Assist and the SDC

have agreed to terminate the Service Delivery Agreement," however. [118-1] Ex. F. Oquendo further testified that Defendant did not terminate another SDC that also failed to log in but whose owner did not file a complaint with the CDOL. See [114-6] ¶¶ 35-39.

Walbancke testified that he made the decision to terminate Oquendo Delivery's agreement before learning about the complaint that Oquendo made to the CDOL. [118-1] ¶¶ 16-17. Walbancke testified that he first learned of Oquendo's complaint on February 23, 2012, when he received a fax about it from the CDOL. *Id.* ¶ 18. Prior to that time, he claimed, he had no knowledge of the complaint. *Id.* ¶¶ 19-21. Walbancke also disputed that Oquendo told him that he felt that he was being treated as an employee, *id.* ¶ 22, and further stated that Connelly never told him about Oquendo's complaints. *Id.* ¶ 23. Walbancke testified that the SDC to which Oquendo likened his own was in substantial compliance with its contract. See *id.* ¶¶ 27-28.

### 2. Analysis

As the Court recognized at the hearing it held on the matter, "one of the major questions is whether there is any authority even to grant an injunction here." Tr. 2, Mar. 12, 2014. The Court notes that the Seventh Circuit has characterized this question as "a significant one, and not without sensible arguments on both sides." *Avitia v. Metro. Club of Chi., Inc.*, 924 F.2d 689, 691 n.1 (7th Cir. 1991).

The FLSA includes a web of provisions governing equitable relief and who may seek it. Section 215(a)(3) of the FLSA straightforwardly provides that

> it shall be unlawful for any person * * * to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding.

29 U.S.C. § 215(a)(3). This is the anti-retaliation provision pursuant to which Plaintiffs have

asserted a claim, see [78] ¶¶ 238-39, and seek the injunctive relief at issue here. Plaintiffs assert that "Section 216(b), in turn, provides for private suits to seek legal and equitable relief for violations of Section 215(a)(3)." [110] at 2. Section 216(b) provides, in pertinent part, that

> Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages. An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. * * * The right provided by this subsection to bring an action by or on behalf of any employee, and the right of any employee to become party plaintiff to any such action, shall terminate upon the filing of a complaint by the Secretary of Labor in an action under section 217 of this title in which (1) restraint is sought of any further delay in the payment of unpaid minimum wages, or the amount of unpaid overtime compensation, as the case may be, owing to such employee under section 206 or section 207 of this title by an employer liable therefor under the provisions of this subsection or (2) legal or equitable relief is sought as a result of alleged violations of section 215(a)(3) of this title.

29 U.S.C. § 216(b).

Section 217, headed "Injunction Proceedings," further provides that in pertinent part that "[t]he district courts * * * shall have jurisdiction, for cause shown, to restrain violations of section 215 of this title * * * *" 29 U.S.C. § 217; see also *Howard v. City of Springfield, Ill.*, 274 F.3d 1141, 1144-45 (7th Cir. 2001) ("Section 217 of the FLSA provides that courts have jurisdiction to enter injunctive relief for violations of the FLSA."). Finally, § 211(a) provides in pertinent part that "Except as provided in section 212 of this title, the Administrator [i.e., the Secretary of Labor] shall bring all actions under section 217 of this title to restrain violations of this chapter." When these provisions are read together, Plaintiffs contend, they provide Plaintiffs with the right to seek injunctive relief for violations of § 215(a)(3).

Plaintiffs find support for their position in *Bailey v. Gulf Coast Transportation, Inc.*, 280

F.3d 1333 (11th Cir. 2002) (per curiam). In *Bailey*, the plaintiffs were terminated shortly after suing their employer for allegedly violating the FLSA. After their termination, the plaintiffs amended their complaint to add a retaliation claim and moved for a preliminary injunction "to reinstate the drivers who were terminated and to enjoin Gulf Coast from further retaliatory conduct." *Id.* at 1334. The district court concluded that although evidence supported the substantive merits of plaintiffs' motion, it could not grant a preliminary injunction because the Eleventh Circuit previously had held in *Powell v. Florida*, 132 F.3d 677, 678 (11th Cir. 1998) (per curiam), "that the right to bring an action for injunctive relief under the Fair Labor Standards Act rests exclusively with the United States Secretary of Labor." The Eleventh Circuit reversed. It distinguished *Powell* on the grounds that its sweeping holding did not address the precise question presented by the *Bailey* plaintiffs –"whether an employee may obtain injunctive relief for violations of the FLSA's antiretaliation provision in § 215(a)(3)." *Bailey*, 280 F.3d at 1335. The Eleventh Circuit examined the statutory scheme outlined above and rejected as "inconsistent with the plain meaning of § 216(b)" defendant's argument "that § 217 governs injunctions under the FLSA, and that § 211 provides that except under the child labor laws [§ 212], the Secretary has exclusive authority to bring proceedings under § 217." *Id.* at 1336. The Eleventh Circuit reasoned that "[a]n injunction [barring] further retaliatory conduct indeed may help to 'effectuate the purposes' of the antiretaliation provision in a case such as this, where the district court found Gulf Coast's conduct 'plainly retaliatory' and where there was evidence that other drivers were fearful of participating in the suit." *Id.*

Plaintiffs also point to an amicus brief that the Secretary of Labor filed in *Bailey*, see [110] Ex. 1, in which the Secretary argued that the FLSA should be interpreted to allow private plaintiffs to pursue injunctive relief for violations of § 215(a)(3). They argue that the Secretary's

position, as set forth in the brief, should be "afforded significant weight, if not complete *Chevron* deference."  [110] at 4.[2]  Plaintiffs additionally note that the Second Circuit has affirmed a district court's grant of an injunction in similar circumstances, see *Mullins v. City of New York*, 626 F.3d 47 (2d Cir. 2010), and identify a handful of district court cases granting injunctions similar to the one sought here.  See *Carrillo v. Schneider Logistics, Inc.*, 2012 WL 556309 (C.D. Cal. Jan. 31, 2012); *Garcia v. Lee*, 2010 WL 2102903 (E.D.N.Y. May 26, 2010); *Bowman v. New Vision Telecoms., Inc.*,  2009 WL 5031315 (Dec. 14, 2009).

Plaintiffs concede, however, that there is authority that cuts against their position. Importantly, two such cases are from the Seventh Circuit.  The older of the two cases, *Howard v. City of Springfield, Illinois*, 274 F.3d 1141, 1145 (7th Cir. 2001), considered whether police officers seeking compensation and injunctive relief for "kennel time" they spent with their K-9s were wrongly precluded from seeking injunctive relief.  The *Howard* court, relying in part on *Powell v. Florida*, 132 F.3d 677, 678 (11th Cir. 1998) (per curiam), the decision that the Eleventh Circuit distinguished in *Bailey*, examined the interaction between §§ 211 and 217 of the FLSA and concluded that "private parties may not seek injunctive relief under the FLSA."  The Seventh Circuit reaffirmed – and provided a policy-based explanation for – this holding in *Heitmann v. City of Chicago*, 560 F.3d 642, 644-45 (7th Cir. 2009), which also involved police officers seeking to enjoin alleged wage and overtime violations.  In *Heitmann*, the officers sought (and were granted by the district court) an injunction "specifying how Chicago must handle all future applications for compensatory leave." *Heitmann*, 560 F.3d at 643.  The Seventh

---

[2] The Court does not afford *Chevron* deference to the interpretations espoused in the Secretary of Labor's amicus brief.  The Secretary of Labor does not have any authority to issue regulations interpreting the FLSA, or specific authority to issue regulations interpreting § 215(a)(3).  See *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1340 (2011) (Scalia, J., dissenting).  The Court instead accords weight to the Secretary's interpretations to the extent that they have the "power to persuade."  See *Skidmore v. Swift & Co.* 323 F.3d 134, 140 (1944); see also *George v. Junior Achievement of Cent. Ind., Inc.*, 694 F.3d 812, 816 (7th Cir. 2012).

Circuit vacated the injunction. See *id.* at 644-45. It reasoned first that because the compensatory leave the officers sought was itself a substitution for overtime pay, any injury that the officers incurred when the officers was adequately compensable by money damages. See *id.* at 644. Moreover, the Seventh Circuit continued, "[i]njunctive relief under § 217 is permissible only in suits by the Secretary of Labor." *Id.* The Seventh Circuit explained that this result made sense from a policy standpoint:

> Injunctions can cause major disruptions to an employer's practices, even though most employees are satisfied with them, and can be impossible to bargain around. The statute leaves the heavy artillery to public officials – or to unions through collective bargaining. * * * A regulatory injunction is hard to administer, and although Congress was willing to involve the judiciary in this process when the Secretary serves as the principal monitor, allowing a handful of disgruntled employees (and their lawyer) to serve as monitors, displacing their representative in collective bargaining, would be unfortunate.

*Id.* Other appellate and district courts have reached similar conclusions. See *Bjornson v. Daido Metal U.S.A., Inc.*, 12 F. Supp. 2d 837, 843 (N.D. Ill. 1998) (collecting cases dating back to 1943). Defendant urges the Court to rely on these cases.

The Court is bound to follow applicable Seventh Circuit precedent. And here, Defendant correctly observes that *Howard* and *Heitmann* contain broad pronouncements that private plaintiffs may not seek injunctive relief under the FLSA. However, the Court agrees with Plaintiffs that neither *Howard* nor *Heitmann* addresses the specific question of whether injunctive relief aimed at preventing violations of § 215(a)(3) is or should be treated differently than injunctive relief aimed at correcting substantive wage and overtime violations of the FLSA. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925); see also *Shawnee Trail Conservancy v. U.S. Dep't of Agric.*, 222 F.3d 383, 387 (7th Cir. 2000) ("In circumstances where a court assumes jurisdiction without

addressing a jurisdictional issue, that assumption of jurisdiction is of limited precedential value.") Indeed, as noted above, the Seventh Circuit itself has indicated that there is a substantial question that is "not without sensible arguments on both sides" as to whether injunctive relief may be available to private FLSA plaintiffs in some circumstances, including the very circumstance presented here. *Avitia v. Metro. Club of Chi., Inc.*, 924 F.2d 689, 691 n.1 (7th Cir. 1991); see also *Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1231 (7th Cir. 1995) ("We cannot find any case in which front pay has been awarded under the Fair Labor Standards Act, but we cannot think of any reason why it cannot be done in a retaliation case under that act since *the victim of retaliation is expressly entitled to all legal and equitable relief that may be appropriate.*" (emphasis added)). The Eleventh Circuit appears to be the only Court of Appeals that squarely has confronted the issue, and it concluded that "the FLSA permits employees to obtain preliminary injunctive relief to address violations of the Act's antiretaliation provision." *Bailey*, 280 F.3d at 1337. The Secretary of Labor and the Second Circuit agree. See [110-1]; *Mullins*, 626 F.3d at 53-56. And, importantly, the Eleventh Circuit in *Bailey* distinguished this situation from its earlier precedent containing sweeping language virtually identical to that in *Howard* and *Heitmann*. See *id.* at 1335; *Powell*, 132 F.3d at 678-79.

*Bailey* does not provide a panacea for Plaintiffs here, however, even if the Court assumes (1) that *Howard* and *Heitmann* permit private plaintiffs to seek injunctive relief under § 215(a)(3) and (2) that Plaintiffs are "employees" entitled to the protections of § 215(a)(3). *Bailey* emphasized that "[a]n injunction [restraining] further retaliatory conduct indeed may help to 'effectuate the purposes' of the antiretaliation provisions" where the conduct challenged was "'plainly retaliatory' and where there was evidence that other drivers were fearful of participating in the suit." *Bailey*, 280 F.3d at 1336 & n.6. Here, Plaintiffs have not demonstrated

that Defendant's conduct was "plainly retaliatory," or that their alleged injuries are not adequately compensable by money damages. See *Heitmann*, 560 F.3d at 644. In other words, even if the Court were to conclude that *Howard* and *Heitmann* do not foreclose Plaintiffs' request for injunctive relief, the Court would be constrained to conclude that injunctive relief is not warranted in this case.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE & PROCEDURE § 2948, at 129-30 (2d ed. 1995)); see also *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005). A party seeking a preliminary injunction must demonstrate as a threshold matter that (1) its case has some likelihood of succeeding on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if preliminary relief is denied. See *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008); see also *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). If the moving party meets its initial burden, then the Court must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. See *Korte*, 735 F.3d at 665; *Girl Scouts*, 549 F.3d at 1086. The Court uses a sliding scale when conducting this balancing analysis; the more likely the movant is to prevail, the less heavily the balance of harms must tip in its favor, and vice versa. See *Korte*, 735 F.3d at 665; *Girl Scouts*, 549 F.3d at 1086. Taking into account all these considerations, the Court must exercise its discretion "'to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case.'" *Girl Scouts*, 549

F.3d at 1086 (quoting *Lawson Prods., Inc. v. Avnett, Inc.*, 782 F.2d 1429, 1436 (7th Cir. 1986)).

To succeed on the merits of their § 215(a)(3) retaliation claim, Plaintiffs must show that Defendant engaged in retaliatory conduct against them as a result of their protected conduct. See *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972-73 (7th Cir. 2012); *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 810 (7th Cir. 2005). That is, they must show that they engaged in protected expression, that they suffered an adverse employment action, and that a causal link existed between the two. *Kasten*, 703 F.3d at 972-73; *Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938, 940 (7th Cir. 1999). They also must show that they are (or were) Defendant's "employees." *Dellinger v. Science Applications Int'l Corp.*, 649 F.3d 226, 228-30 (4th Cir. 2011); *Glover v. City of N. Charleston, S.C.*, 942 F. Supp. 243, 246-47 (D.S.C. 1996); *Harper v. San Luis Valley Reg'l Med. Ctr.*, 848 F. Supp. 911, 913-14 (D. Colo. 1994). Plaintiffs' suggestion that they must simply be the "'employees' of *some* employer," [110] at 7, is not persuasive.

At this stage, the Court concludes that Plaintiffs have a "better than negligible" likelihood of making the latter showing. *Girl Scouts*, 549 F.3d at 1096. Plaintiffs' testimony at the hearing and other evidentiary submissions raise the possibility that they "as a matter of economic reality are dependent upon the business to which they render service." *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1534-35 (7th Cir. 1987). But even assuming that Plaintiffs could make this latter showing, they have not at this stage demonstrated a likelihood of success on their claim that their working relationships with Defendant were terminated as a result of their participation in this suit or other protected activity. Plaintiffs who claimed that they have been retaliated against and testified at the hearing or submitted an affidavit conceded that their SDCs did not satisfy the terms of their agreements with Defendant. For instance, Plaintiff Brown acknowledged that he

lacked liability insurance and was not available to drive on some occasions. Plaintiff Palmer conceded that he did not log in for substantial stretches of time, and Plaintiffs Nasir and Rushdi testified that they did not respond to calls. Filing a complaint or participating in legal action does not equate to a license to abdicate one's work responsibilities with impunity. See *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011). Indeed, "to reach the pretext stage of the *McDonnell Douglas* analysis," Plaintiffs are "required to present a prima facie case of retaliation by demonstrating, among other things, that '[they were] performing [their] job in a satisfactory manner.'" *Cichon*, 401 F.3d at 811 (quoting *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). Plaintiffs did not do that here. Moreover, Plaintiffs' "comparator" testified on cross-examination that his purported fear of retaliation was based on incomplete information about named Plaintiffs' conduct – and in any event he has joined the suit. In fact, thirty-eight Plaintiffs have opted into the suit, which suggests that "fear of economic retaliation" has not "operate[d] to induce aggrieved employees quietly to accept substandard conditions." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960). On this evidence, the Court cannot conclude that Plaintiffs have demonstrated a likelihood of success on the merits of their retaliation claim.

Because the Court concludes that Plaintiffs failed to demonstrate a likelihood of success on the merits of their claim, the motion for preliminary injunction must be denied. See, *e.g., Cox v. City of Chi.*, 868 F.2d 217, 223 (7th Cir. 1989). But in the interest of completeness, the Court will briefly address the other elements of a preliminary injunction.

The other two threshold elements that Plaintiffs must prove to support the issuance of a preliminary injunction are that they (1) have no adequate remedy at law and (2) will suffer irreparable harm if the injunction is not issued. These two requirements tend to merge. See

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). "The question is then whether the plaintiff will be made whole if he prevails on the merits and is awarded damages." *Id.* An injury is "irreparable" when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard. *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997). Here, Plaintiffs concede in their brief that they "are willing to seek legal and not preliminary injunctive relief" as it relates to their own claims, [110] at 5, which strongly suggests that money damages would be adequate to compensate Plaintiffs – or the others on whose behalf they purport to proceed. (Defendant is correct that "retaliation" by definition may only occur against individuals who have engaged in protected activity, not those who heretofore have not elected to opt into or otherwise participate in this action.) The FLSA provides for "legal or equitable relief," 29 U.S.C. § 215(a)(3), but Plaintiffs have not demonstrated that they are seeking equitable relief such as "employment, reinstatement, [or] promotion," § 215(a)(3), or that legal relief would be inadequate to compensate them for any injury they suffered. Additionally, Defendant accurately points out that Plaintiffs did not immediately seek to enjoin the alleged retaliation, which "may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001). Plaintiffs' suggestion that the harm here "goes beyond the normal harm of losing a job" because they and others are in the "grip of poverty," [110] at 6; Tr. 20, Mar. 12, 2014, rests on an inapposite case. See *Moore v. Miller*, 579 F. Supp. 1188, 1191-92 (N.D. Ill. 1983). Additionally, Plaintiff Brown testified that, after filing suit against Defendant, he was able to obtain a job towing cars and assisting AAA members and is paid ten dollars per hour plus a commission of $7 per tow. See Tr. 147-48, Mar. 12, 2014. Although ten dollars per

hour is not a particularly high wage, it is clear that the termination of 2Browns' contract with Defendant did not, as Plaintiffs suggest, "force [Brown] into untenable financial straits without even the promise of unemployment benefits."  [110] at 6.

Finally, balancing the irreparable harm to the moving party if an injunction is not entered against the harm to the non-moving party if an injunction is granted requires the Court to use a "sliding-scale approach":  the more likely the plaintiff will succeed on the merits, the less the balance of harms need favor the plaintiff's position.  See *Korte*, 735 F.3d at 665.  Here, Plaintiffs have failed to show that they are likely to succeed on the merits and thus the balance of harms must tilt heavily in Plaintiffs' favor in order to justify relief.  It does not.  Plaintiffs have indicated that money damages will be adequate to remedy any injury that they have suffered or will suffer.  Potential opt-in Plaintiffs will not be harmed, as they have been notified via the opt-in notice and consent form that the FLSA prohibits retaliation.  See [82].  Defendant would not be harmed by an injunction prohibiting retaliation – "[t]he company always has the legal right to discipline * * * in a nondiscriminatory fashion for improper conduct," *N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996) – but it may suffer harm from an injunction barring it from knowing the identities of the opt-in Plaintiffs.  So too would the public interest.  See *Korte*, 735 F.3d at 665 (the court also must consider the public interest when weighing the harms).  As Plaintiffs point out, "[t]he public benefits from full and frank public litigation." [110] at 11.  Part of Plaintiffs' requested relief – that the Court maintain under seal the participating Plaintiffs' names – runs counter to this interest.  In addition, given that Plaintiffs have not established that Defendant has engaged in retaliation, it would run counter to the Court's obligation to "be scrupulous to respect judicial neutrality" in its management of collective actions, as would the requested (additional) extension of the opt-in period.  *Hoffmann-La Roche Inc. v. Sperling*, 493

U.S. 165, 174 (1989).

### III. Conclusion

At this time, the Court can see no basis for judicial intervention in the form of the entry of preliminary injunctive relief as Plaintiffs have requested. Accordingly, for the reasons stated above, Plaintiffs' motion for preliminary injunction, to maintain documents under seal, and to extend opt-in period [105] respectfully is denied. The motion to supplement [114] is granted. Plaintiffs are given until 5/21/2014 to show cause why the names of the opt-in Plaintiffs should remain under seal. This matter is set for status on 5/28/2014 at 10:30 a.m. The parties should be prepared to discuss Plaintiffs' outstanding motion to strike Defendant's third-party complaint [75] with the Court at that time.

Dated: May 9, 2014

Robert M. Dow, Jr.
United States District Judge